# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

### 08-1335

STATE OF LOUISIANA

VERSUS

BRIAN A. VERRET

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. 114269
HONORABLE MARILYN CARR CASTLE, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

## MARC T. AMY
## JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of Sylvia R. Cooks, Marc T. Amy and J. David Painter, Judges.

**CONVICTIONS AFFIRMED. SENTENCES VACATED. REMANDED FOR RESENTENCING.**

**Michael Harson**
**District Attorney**
**J.N. Prather, Jr.**
**Assistant District Attorney**
**Post Office Box 3306**
**Lafayette, LA   70502-3306**
**(337) 232-5170**
**COUNSEL FOR APPELLEE:**
    **State of Louisiana**

**Carey J. Ellis, III**
**Louisiana Appellate Project**
**Post Office Box 719**
**Rayville, LA   71269**
**(318) 728-2043**
**COUNSEL FOR DEFENDANT/APPELLANT:**
    **Brian A. Verret**

AMY, Judge.

The defendant was charged with four counts of negligent homicide, violations of La.R.S. 14:32. A jury found him guilty as charged, and the trial court sentenced him to serve five years at hard labor on each count, to run concurrently. One year of the sentence was suspended. Further, it ordered the defendant to pay restitution in an amount to be determined by the Division of Probation and Parole or after a hearing subsequent to his incarceration. The defendant appeals, arguing that the evidence is insufficient to support his convictions and that the restitution portion of his sentences is not founded in law. For the reasons that follow, we affirm the defendant's convictions but vacate the defendant's sentences and remand the matter to the trial court for resentencing.

**Factual and Procedural Background**

On September 30, 2006, the defendant, Brian A. Verret, was traveling in his Mustang on Ambassador Caffery Parkway in Lafayette toward Johnston Street. The State presented witnesses who testified that he appeared to be racing another vehicle, a black Honda CRX, as he approached the bridge on Ambassador Caffery. The State alleged that while on the bridge, the defendant lost control of his Mustang, entered a lane of oncoming traffic, and hit a vehicle, a white Honda Accord. The Honda Accord was occupied by James Thibodeaux, Danielle Thibodeaux, Jeremy Meche, and Sunshine Jasek. All four of the occupants died as a result of the automobile crash.

The defendant was charged with four counts of negligent homicide, violations of La.R.S. 14:32. A jury convicted him on all four counts, and the trial court ordered a presentence investigation. At the sentencing hearing, the trial court sentenced the defendant to five years at hard labor on each count, to run concurrently with one

another. One year of the sentence was suspended, and as a condition of probation, the defendant was ordered to pay restitution in an amount to be determined. The defendant appeals, contending that "[t]here was insufficient evidence to convict Defendant of negligent homicide," and "[t]he sentence is not founded in law with respect to restitution ordered."

## Discussion

*Errors Patent*

Pursuant to La.Code Crim.P. art. 920[1], all appeals are reviewed for errors patent on the face of the record. After reviewing the record, we find an error patent requiring the sentences to be vacated.

At the sentencing hearing, the trial court stated:

> For each count of negligent homicide, I am imposing a sentence of imprisonment at hard labor for five years. All of those will be concurrent sentences.
>
> I am ordering that you serve four years of this sentence and that one year of the sentence be suspended. And I am suspending that year because I want to - - During the term of probation, there are some conditions to be met, including some restitution payments to be made in that.
>
> The suspension of the one year that's going to be suspended after the first four years are served are going to be conditioned on the following:

---

[1] Louisiana Code of Criminal Procedure Article 920 provides:

**Art. 920. Scope of appellate review**

The following matters and no others shall be considered on appeal:

(1) An error designated in the assignment of errors; and

(2) An error that is discoverable by a mere inspection of the pleadings and proceedings and without inspection of the evidence.

. . . .

The period of probation is going to be four years, to give him time to make those restitution payments.

The trial court unequivocally imposed a five-year sentence on each count to run concurrently. When it ordered suspension of one year and discussed the terms and length of probation, however, the trial court only referred to one sentence. Insofar as the trial court failed to specify to what counts the suspension and probationary period applied, the trial court imposed indeterminate sentences.

This court addressed a similar issue in *State v. Morris*, 05-725, p. 9 (La.App. 3 Cir. 12/30/05), 918 So.2d 1107, 1113, wherein it found that "[t]he trial court imposed indeterminate sentences because it suspended the sentences and placed Defendant on five years of supervised probation without specifying to which count or counts the probation applied." In *Morris*, 918 So.2d 1107, the court quoted from *State v. Taylor*, 01-680, p. 2 (La.App. 3 Cir. 11/14/01), 801 So.2d 549, 550:

> After suspending five years of the defendant's eight-year sentence and the totality of the six-year sentence, the trial court imposed a five-year supervised probation period. It is unclear, however, to which sentence this probation period applies or whether it applies to each. Thus, the sentences are indeterminate and in violation of La.Code Crim.P. art. 879, which provides: "If a defendant who has been convicted of an offense is sentenced to imprisonment, the court shall impose a determinate sentence."

> Finding the defendant's sentences indeterminate, we vacate the sentences and remand this matter to the trial court for the imposition of determinate sentences. In doing so, we instruct the trial court to specify whether the periods of probation are to be served concurrently or consecutively and upon what point the probated sentences begin as to each count. *See* La.Code Crim.P. art. 883.

Accordingly, we vacate the sentences on the grounds they are indeterminate and remand the case for resentencing. Upon remand, if any periods of probation or

3

suspension are imposed, the trial court is instructed to specify to which count(s) they apply.

*Insufficiency of Evidence*

In his first assignment of error, the defendant argues that "[t]he evidence presented was insufficient to support the jury verdicts of negligent homicide." Particularly, he asserts that the identity of the defendant as the driver who was driving erratically was never positively established, especially in light of the fact that there were allegedly two cars racing.

This court set forth the analysis for evaluating a claim of insufficient evidence:

> When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, *rehearing denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979); *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the *Jackson* standard of review. *See State ex rel. Graffagnino*, 436 So.2d 559 (citing *State v. Richardson*, 425 So.2d 1228 (La.1983)). In order for this Court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

*State v. Kennerson*, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371.

A jury convicted the defendant of four counts of negligent homicide. Louisiana Revised Statutes 14:32 provides, "[n]egligent homicide is the killing of a human being by criminal negligence." "Criminal negligence exists when, although neither specific nor general criminal intent is present, there is such disregard of the interest of others that the offender's conduct amounts to a gross deviation below the

standard of care expected to be maintained by a reasonably careful man under like circumstances." La.R.S. 14:12. In relation to causation, the fifth circuit stated:

> The Louisiana Supreme Court has held it is not essential that the State prove the defendant's action was the sole cause of the victim's death. In a case involving charges of negligent homicide arising from a "drag racing" accident, the supreme court found the proper test is whether the defendant's conduct was a substantial factor in bringing about the ensuing death." *State v. Martin*, 539 So.2d 1235, 1239 (La.1989), citing *State v. Matthews*, 450 So.2d 644, 646 (La.1984).

*State v. Bellow*, 08-259, pp. 11-12 (La.App. 5 Cir. 7/29/08), 993 So.2d 307), 314.

William Sandy Kaplan testified that he was stopped at the traffic light at the corner of Settlers Trace and Ambassador Caffery Parkway on the night of September 30, 2006. He testified that he was familiar with "high-performance motors" as he "was one of the founding members of the Porsche Club of America chapter here in Lafayette in the late '70's." He stated that on September 30, 2006, he "saw two cars racing down Ambassador Caffery towards the mall." He continued, stating, "I thought to myself, oh, my God, man, somebody's going to get hurt doing that. Because they were going very, very fast. And they were red-lining." He explained that "[r]ed-lining is when an engine is revved up very, very fast, and it's going at the top speed in that gear. It makes a whining sound." Mr. Kaplan further explained that he thought one of the cars was a Mustang and that the other was either a Mustang or a Honda. Ultimately, he concluded that he had "no doubt" that one of the cars was a Mustang, and there was "absolutely, unequivocally no doubt in [his] mind" that the two cars were racing. The day after the accident, Mr. Kaplan read about the crash and contacted the police.

Kristen Kahanek testified that on September 30, 2006, at 9:30 p.m., she was traveling in the left lane on Ambassador Caffery towards the mall. She heard "very,

5

very loud mufflers approaching from behind." She stated that the cars passed her and that the Mustang switched lanes very quickly several times. When asked about the speed of the vehicles, she stated that "it seemed as if they were going about 100 miles an hour." She indicated they were driving at an "extreme rate of speed" and appeared to be racing. She stated that the Mustang drove into oncoming traffic after switching lanes several times. Further, she testified that she saw the brake lights of the Mustang when it entered into oncoming traffic but never saw brake lights on the other vehicle.

In the statement she gave the night of the accident, Ms. Kahanek said she thought both of the cars were Mustangs. She testified that the car that almost hit her while changing lanes was a Mustang, and she recognized the car because her sister and her neighbor both drove Mustangs. Also, in her statement to the police, she explained that the cars appeared to be going 100 miles an hour but acknowledged that they could not have been driving that fast. She testified that "[i]t was definitely, definitely faster than 50."

Pam Ballantyne and her husband were traveling on Ambassador Caffery toward Verot School Road on September 30, 2006. She testified that as they were getting onto the bridge, she noticed that headlights were coming toward her. She stated, "[i]n that instant, the car that was coming towards us slammed into the car that was in front of us." Based on her observation of the crash, she indicated she did not think the driver of the Honda Accord could have done anything to avoid the collision.

Tyrone Cormier testified that he and his wife were driving on Ambassador Caffery toward Kaliste Saloom Road two cars behind the Honda Accord involved in the accident. He stated that he "noticed a vehicle that was coming across the double yellow, into [his] lane. And it was a loud - - a loud collision."

6

The State's next witness was Corporal Michael J. Onezime, the traffic motor officer in charge of the investigation of this accident. He testified that he left the scene of the accident and went to the intensive care unit at Lafayette General to speak to the defendant. After personally determining that the defendant was lucid, alert, and able to converse, Corporal Onezime stated that he advised the defendant of his *Miranda* rights and he inquired about the accident. He testified that the defendant relayed to him that he and his girlfriend went to the Sonic on Kaliste Saloom Road, ate a Blizzard, and drove down Ambassador Caffery at about 60 miles an hour. When questioned about the events that transpired once he was on the bridge, the defendant told Corporal Onezime that he could not remember. Corporal Onezime explained that the defendant "kind of paused and glanced at his father, and then looked back at [him] and said he don't [sic] remember or couldn't recall." The officer further stated that he asked the defendant "if there was any vehicle or anything that would have prevented him from operating his vehicle in a safe manner, and he stated no." His testimony also indicated that the defendant's father spoke with him privately and was aware of the issue of racing despite the fact that the officer never mentioned it previously.

Natalie Metrejean testified that she was driving the car immediately behind the Honda Accord. She described the collision as an "explosion" and stated that she did not see any reckless operation by the victim.

The State also called James Lee Haygood, III to testify. The record indicates that Mr. Haygood was a passenger in the black Honda CRX driven by James Scott, the individual who was allegedly racing with the defendant. Mr. Haygood was traveling on Ambassador Caffery toward Johnston Street on the night of September

7

30, 2006. He stated that they were traveling in the left lane and that the defendant drove past them on the right. He testified that nothing was said or gestured between the two cars and once the defendant passed them, they accelerated and got into the right lane. He claimed that he then saw "the Mustang coming up, you know, faster than normal[.]" Mr. Haygood indicated that he checked the side mirror and noticed the defendant's headlights go to the left. Then he heard what he called "an explosion," and he looked behind him and saw the Mustang rotating. He told Mr. Scott that someone just wrecked. He stated that Mr. Scott did nothing to contribute to the accident; he testified that Mr. Scott maintained his speed and never slammed on the brakes while crossing the bridge. Mr. Haygood told the investigating officer the reason they did not return to the scene to talk to the police that night was because they were nervous and scared.

James Scott testified that he was driving a 1991 Honda CRX the night of the accident. He stated that the defendant "came up on the side of me really fast." He explained that he accelerated to get in the right lane in order to pass the defendant. Further, his testimony reveals that he tried to return to the bridge after the crash, but police and emergency personnel were already there. He and Mr. Haygood then continued on to their friend's house. He indicated that he did not immediately contact the police because he was scared, nervous, and had been an accident once wherein he had almost been killed. The record shows that Mr. Scott had a history of traffic-related offenses.

Tracy Campbell, the defendant's passenger and girlfriend, testified that she and the defendant were driving on Ambassador Caffery after having gone to eat ice cream at Sonic. She stated that while on Ambassador Caffery, a vehicle drove by them on

8

the left, making a "whining noise." She explained that the other car "stayed on the side of [them], kind of revving the engine, speeding up, slowing down." She said it was possible that the defendant revved his engine in response. She stated that nothing about the defendant's speed alarmed her. She testified that the "small black car on the – to the left of [them] sped up, got in the front of [them], and slammed on [its] brakes." After the car slammed on its brakes, she stated that the defendant lost control of the vehicle. She indicated that while she visited the defendant at the hospital, the defendant appeared to be confused and did not seem to know that she was in the accident with him.

Richard L. Fox was accepted as an expert in traffic accident reconstruction. Regarding the speed of the vehicles involved in the crash, Mr. Fox testified as follows:

> So from 32 to 37 is the post-impact speed for the Mustang. Delta-v was 52. If you add those together, he [the defendant] could have been going 89, looking at those figures.

> Therefore, with the [victim's] Honda doing 40 miles an hour, the Mustang was going between 72 and 82 just before the impact.

When asked about the possibility of Mr. Thibodeaux, the driver of the Honda Accord, reacting to avoid the collision, Mr. Fox testified that "[a]t 40 miles per hour, I calculated that Mr. Thibodeaux needed at least 2.232 seconds to take a meaningful reaction to the hazard that he was faced with." He explained, however, that his investigation led to the conclusion that Mr. Thibodeaux only had .7136 seconds, assuming that he actually saw the Mustang while it was losing control. Had he not seen the Mustang spinning out of control, the reaction time as calculated by Mr. Fox would only have been .5 seconds. It was his opinion that "Mr. Thibodeaux had no chance to avoid the crash."

9

The defense called Michael James, Jr., who was accepted as an expert in accident reconstruction and human factors that relate to accidents. He testified that based on his calculations, the defendant was traveling fifty-five to sixty miles per hour prior to losing control. Mr. Fox testified again as a rebuttal witness and stated that Mr. James's formula used to determine the speed of the Mustang was not correct.

Regarding reaction time, Mr. James stated that Mr. Thibodeaux would have had 1.5 seconds to react — enough time, he claims, to jerk a steering wheel and avoid the collision. However, he ultimately admitted that if Mr. Thibodeaux failed to see the Mustang initially losing control, he would not have reacted.

Vernon "Dean" Tekell, Jr. testified for the defense as an expert in the field of traffic engineering. His testimony related to the operating speeds along the pertinent part of Ambassador Caffery; the November 2006 speed study he relied on indicated that over seventy (70) percent of the vehicles that travel on the Ambassador Caffery bridge travel over fifty (50) miles an hour and that seventy-nine (79) percent traveled between forty-five (45) and fifty-four (54) miles per hour. He testified that the maximum speed limit posted at the time of the accident was fifty (50) miles an hour but that "[i]n the area of the bridge, it would not at all be unreasonable to post a speed limit of [fifty-five] 55 miles an hour."

Dr. Emil Laga, an expert in forensic pathology and toxicology, testified that the driver of the Honda, Mr. Thibodeaux, "smoked marijuana within three hours prior to the drawing of the blood," which was done shortly after the accident. He added that "the risk of being involved in an accident while having that kind of a count of marijuana in your blood is increased at least two times over what is being seen in people involved in accidents that do not have any marijuana in their blood."

10

Further, Dr. Laga testified that the defendant did not have any alcohol or drugs in his system at the time of the accident. However, while at the hospital, he was administered Versed and morphine—a combination of medicine that can, according to Dr. Laga, impair a person's memory about events that happened before and after the time the drugs were administered.

On appeal, the defendant argues that the evidence was insufficient to convict him of four counts of negligent homicide. In particular, he claims that "Mr. Kaplan did not testify that he could identify either one of the cars or the occupants." He also contests Ms. Kahanek's characterization of the Mustang as the vehicle that changed lanes erratically, pointing out that in her statement to the police she described both cars as Mustangs. Further, the defendant contends that Ms. Ballantyne "could not estimate the speed of Defendant's Mustang." In light of Mr. Kaplan and Ms. Kahanek's testimony regarding the excessive speeding of two cars, the identification of a Mustang as an involved vehicle, and their independent observations of erratic lane changing, the jury could have determined that their failure to positively identify the defendant in the vehicle is of no consequence. Further, the jury could have given more weight to the expert testimony of Mr. Fox than to that of Mr. James. Insofar as a rational jury could have found the defendant guilty of negligent homicide beyond a reasonable doubt based on the evidence presented, we find that this assignment of error lacks merit.

*Restitution*

In his second assignment of error, the defendant contends that the portion of his sentence imposing restitution is not founded in the law. The trial court, as a

11

condition of the defendant's probation, ordered the defendant to pay restitution as follows:

> . . . you make restitution payments, which are to be in addition to any insurance payments made.
>
> And, rather than setting specific restitution amounts - - Because I know that, at this time, Mr. Verret is gainfully employed and making a significant income - - I'm not sure what his situation will be when he is released - - I am going to ask that probation and parole make a determination.
>
> But I do want it clear that I want restitution paid to the children of all of these people - - in other words, the son of Danielle and James Thibodeaux, to the daughter of Jeremy Meche, and to the children of Sunshine Jasek.
>
> And the probation officer - - I am going to ask for their input into it. If there cannot be some determination made, then, at that appropriate time, we will have a hearing to determine the amount of restitution.
>
> I don't want to impose an amount that's impossible to pay, but, on the other hand, I want an amount that's commensurate with his ability to pay and with the needs in this case - - particularly, these children that are without families.

Louisiana Code of Criminal Procedure Article 895.1 provides:

> A. (1) When a court places the defendant on probation, it shall, as a condition of probation, order the payment of restitution in cases where the victim or his family has suffered any direct loss of actual cash, any monetary loss pursuant to damage to or loss of property, or medical expense. The court shall order restitution in a reasonable sum not to exceed the actual pecuniary loss to the victim in an amount certain. However, any additional or other damages sought by the victim and available under the law shall be pursued in an action separate from the establishment of the restitution order as a civil money judgment provided for in Subparagraph (2) of this Paragraph. The restitution payment shall be made, in discretion of the court, either in a lump sum or in monthly installments based on the earning capacity and assets of the defendant.

In *State v. Alexander*, 03-167, p. 3 (La.App. 3 Cir. 9/10/03), 854 So.2d 456, 458-59, *writ denied*, 03-2822 (La. 3/12/04), 869 So.2d 815, this court stated:

12

As a condition of probation, the Defendant was ordered to pay a monthly supervision fee and to make restitution to the city of Jeanerette for the expenses incurred as a result of the crime, in an amount to be determined by the Defendant and his probation officer. The judge stated he would hold a hearing and determine the amount of restitution only if the Defendant and his probation officer did not agree on the amount to be paid.

The first error patent concerns the failure of the trial judge to establish the amount of restitution to be paid by the Defendant. This resulted in an illegal sentence. In *State v. Dauzat*, 590 So.2d 768, 775 (La.App. 3 Cir.1991), *writ denied*, 598 So.2d 355 (La.1992), this court stated:

> When a sentencing judge orders a defendant to make restitution to the victim, both La.C.Cr.P. arts. 895(A)(7) and 895.1 require the court, and not the probation officer, to determine the amount of restitution. Because the court failed to determine the amount of restitution owed as a special condition of probation, the defendant's sentence is illegal. *State v. Hardy*, 432 So.2d 865 (La.1983). *State v. Rogers*, 517 So.2d 428 (La.App. 1st Cir.1987).

This error cannot be corrected by an appellate court. Therefore, defendant's sentence must be reversed with the case to be remanded for resentencing. Upon resentencing, the judge must determine the amount of money taken by the defendant which was not covered by insurance. Restitution for this loss may be ordered pursuant to either La.C.Cr.P. arts. 895 or 895.1.

Therefore, the Defendant's sentence is vacated and the case remanded for resentencing.

Further, in *State v. Stevens*, 06-818 (La.App. 3 Cir. 1/31/07), 949 So.2d 597, this court, sitting en banc, overruled a case which held that the method and amount of payment for restitution could not be set by the probation and/or parole officer despite said determination being subject to the trial court's approval. In so holding, this court stated:

> Upon reconsideration, we find nothing in the statute which prohibits the trial court from seeking assistance from outside sources, including Probation and Parole, in formulating the appropriate payment plan. In fact, Probation and Parole may be in a better position to formulate a workable payment schedule than is the trial court. In taking

advantage of this assistance, the trial court in no way cedes its responsibility to impose the payment plan, and *it only becomes effective upon approval of the trial court*. Therefore, we overrule this court's previous decision in *State v. Brack*, 758 So.2d 310.

*Id*. at 599-600 (emphasis added).

Our error patent review in the present case revealed that the sentences must be vacated due to the trial court's failure to specify on which count(s) probation and suspension were imposed; additionally, we note that pursuant to *Stevens*, 949 So.2d 597, the trial court may seek assistance in determining the amount of restitution owed and the manner of its payment. Yet *Stevens*, 949 So.2d 597 makes clear that the determination will not have any effect until approved by the trial court. Accordingly, the matter is remanded to the trial court with the instruction that should it impose restitution, it comply with La.Code Crim. P. art. 895.1 and *Stevens*, 949 So.2d 597.

## DECREE

For the foregoing reasons, the defendant's convictions for negligent homicide are affirmed. The sentences are vacated, and the matter is remanded to the trial court for resentencing with the instructions that if any suspension or probation is ordered, it be specified on which count(s) they are imposed and if restitution is ordered that it be in accordance with this opinion.

**CONVICTIONS AFFIRMED. SENTENCES VACATED. REMANDED FOR RESENTENCING.**